In re Interest of Deztiny C., a child
under 18 years of age.
State of Nebraska, appellant, v.
Christopher C., appellee.

723 N.W.2d 652

Filed November 14, 2006.    No. A-06-242.

Stuart J. Dornan, Douglas County Attorney, and Eric D. Strovers for appellant.

Brandie M. Fowler for appellee.

IRWIN, SIEVERS, and CARLSON, Judges.

IRWIN, Judge.

## I. INTRODUCTION

The State of Nebraska appeals an order finding that termination of Christopher C.'s parental rights would not be in the best interests of his minor child, Deztiny C. On appeal, the State asserts that the juvenile court erred in finding the State failed to prove that (1) Christopher abandoned Deztiny, (2) Christopher neglected Deztiny, (3) termination of Christopher's parental rights would be in Deztiny's best interests, and (4) reasonable efforts were not required to preserve and reunify the family. We affirm the juvenile court's order.

## II. BACKGROUND

### 1. CHRISTOPHER AND ANDREA'S RELATIONSHIP

Deztiny was born on March 4, 1998, to Andrea B. and Christopher. Christopher characterized his relationship with Andrea as "volatile." He claimed Andrea was "suicidal" and an "alcoholic."

During Christopher and Andrea's relationship, Christopher was convicted of criminal charges on three separate occasions. In 1998, Christopher was convicted of third degree assault, willful reckless driving, and operating a motor vehicle to avoid arrest. A child neglect charge stemming from the incident was later dropped. Christopher was sentenced to 18 months of probation. In 1999, he was convicted of misdemeanor assault on Andrea. Later, in 1999, he violated probation and was sentenced to serve 90 days in jail. In 2000, Christopher was charged with misdemeanor child abuse and fined $50 after Deztiny wandered away from the house through an open garage door.

Christopher and Andrea ended their relationship in 2000, and Andrea retained custody of Deztiny. According to Christopher's testimony, a district court judge entered a paternity order in 2001 which established that Christopher is Deztiny's father and granted him visitation. Christopher testified that after the court granted visitation, his visits with Deztiny "became sporadic," because he "just couldn't get ahold of Andrea." Christopher

testified he called the judge's secretary and was told that he "should seek counsel."

The evidence shows that in 2002, the district court for Douglas County entered a paternity order, which established that Christopher is Deztiny's father and ordered him to pay monthly child support of $50 beginning April 1, 2002.

On January 27, 2004, the State removed Deztiny and her half brother from Andrea's custody. The State alleged the children came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002). The parental rights of Andrea are not at issue in this appeal because the record reveals she died on January 18, 2005.

### 2. CHRISTOPHER'S CONTACT WITH DHHS

On February 11, 2004, Christopher met with Andrea Bigham, Deztiny's initial Nebraska Department of Health and Human Services (DHHS) caseworker, to discuss how to obtain custody of Deztiny. Bigham testified she told Christopher that "if he wanted to be a party to this case, he would need to show up to court [on February 25, 2004,] and ask to formally intervene." She told Christopher that he needed to complete a background check and provide DHHS with a copy of his paternity decree. Christopher complied with both requirements.

Regarding visitation, both Bigham and Christopher testified she told him that she would send a "referral" to Visinet and that "[Visinet] would be contacting him for visitation, but it would have to be supervised." Bigham testified that she sent the referral but that she did not conduct any followup.

On February 25, 2004, the juvenile court ordered that Deztiny remain in DHHS' custody. Although Christopher was not a party to the hearing, he did attend.

At the hearing, Bigham informed the juvenile court that Christopher would "like to have visits" with Deztiny. The court asked Christopher if he had a copy of the order granting visitation, and Christopher stated he gave a copy to Bigham and did not have an additional copy with him. Christopher told the court he intended to intervene and that he was "in the steps of hiring [an attorney]" and was "trying to find the right one." The juvenile court stated that it could not grant Christopher visitation until Christopher provided proof that he is Deztiny's father.

The court "highly recommend[ed]" that Christopher contact an attorney.

In February 2004, Deztiny's case was transferred to a new DHHS caseworker, Nicole Nietfeld. Nietfeld testified that Christopher "may not have been aware that [she was his] case worker" between February 2004 and May 2005 and that Christopher was not given any information of how to contact her in order for him to intervene. He eventually spoke to Nietfeld on May 16, 2005, and told her he wanted custody of Deztiny but would be willing to "start out with visitation first."

Nietfeld testified that Christopher told her he had not contacted DHHS between February 2004 and May 2005 because he was "scared of Court" and "didn't know what to expect." Christopher testified that he had been afraid but that he had been "waiting by the telephone for someone from [DHHS] to call," because Bigham said she "set [him] up visits with 'Omni Visit.'" He testified that when no one called, he called DHHS probably a "couple dozen" times. When Nietfeld was asked about DHHS' procedure with regard to telephone messages, she testified, "I don't think we have a procedure in regards to phone messages." She stated that although those with DHHS try to return telephone calls to the "best of our ability," she did not think there is "actually a policy."

Nietfeld testified that in general, when fathers have expressed an interest in intervening, DHHS "does attempt to make contact with the fathers." She testified that she did not attempt to make any contact with Christopher, because Bigham "had made the [initial] contact." Nietfeld testified that the initial conversation between Bigham and Christopher was the only contact DHHS had with Christopher in regard to intervening.

### 3. Supplemental Petition

On August 16, 2005, the juvenile court granted Christopher supervised visitation with Deztiny. On August 18, the State filed a seven-count supplemental petition asserting that Christopher's lack of parenting caused Deztiny to come within the meaning of § 43-247(3)(a). The State sought to terminate Christopher's parental rights pursuant to Neb. Rev. Stat. § 43-292(1), (2), and (7) (Reissue 2004). The State also asserted that termination of Christopher's parental rights was in Deztiny's best interests and

that reasonable efforts to reunify the family were unnecessary pursuant to Neb. Rev. Stat. § 43-283.01 (Reissue 2004). The hearing on the supplemental petition took place on December 15, 2005, and was continued on February 15, 2006.

### 4. TESTIMONY AT TERMINATION HEARING

Nietfeld testified that Christopher began supervised visits with Deztiny in October 2005 and brought meals, games, and crafts that were "age appropriate." Between October 2005 and February 2006, Christopher missed four of the twice-a-week visits. According to Nietfeld, in the first few visits, Christopher told Deztiny he wanted to provide for her. DHHS told Christopher that he should not "talk about the nature of this case" to Deztiny. Nietfeld testified that since then, the visits were going "better." Nietfeld also testified to one incident where, because the visiting room had been overbooked, Christopher raised his voice and "slammed [two bags of games] down."

Nietfeld testified that she was unaware of any contact between Christopher and Deztiny prior to May 2005, when Christopher initially contacted Nietfeld. Contradicting Nietfeld's testimony, Christopher stated that he saw Deztiny on March 4, 2005. He testified that he went to her school and gave her a card, stuffed rabbit, and television for her birthday.

While Nietfeld testified to her concerns regarding Christopher as a parent, which we have discussed above, when asked about her professional opinion, she testified that terminating Christopher's parental rights would be in Deztiny's best interests, based on Christopher's criminal history. Nietfeld also testified that it would be in Deztiny's best interests to remain with her maternal grandmother, because Deztiny needed "permanency" and the grandmother was willing to adopt Deztiny. Deztiny had been placed with her grandmother after being moved from her foster home in September 2004.

According to Christopher's testimony, he no longer had "a problem controlling [his] temper." When describing his current situation, Christopher testified that he was in a 10-week parenting class at Child Saving Institute and had already completed 2 weeks. He testified that he physically saw Deztiny "all the time"—at the grocery store, riding in her grandmother's car, and at church. He testified that he is currently paying child

support by having it automatically withdrawn from his paycheck. Between April 2002 and December 2005, Christopher paid $1,822.03 in child support and had an arrears balance of $394.06, plus interest.

At the termination hearing, the juvenile court found by a preponderance of the evidence that Deztiny came within the meaning of § 43-247(3)(a). The court also found by clear and convincing evidence that Deztiny came within the meaning of § 43-292(7). The court dismissed the termination of parental rights claim under § 43-292(1) and (2) for lack of clear and convincing evidence. Additionally, the court concluded that termination of Christopher's parental rights was not in Deztiny's best interests and that the State was required to make reasonable efforts to reunify Christopher and Deztiny. The State timely filed this appeal.

## III. ASSIGNMENTS OF ERROR

On appeal, the State has assigned four errors. First, the State asserts that the juvenile court erred in finding that Christopher had not abandoned Deztiny pursuant to § 43-292(1). Second, the State asserts that the juvenile court erred in finding that Christopher had not neglected Deztiny pursuant to § 43-292(2). Third, the State asserts that the juvenile court erred in finding that termination of Christopher's parental rights was not in Deztiny's best interests. Fourth, the State asserts that the juvenile court erred in finding that reasonable efforts to preserve and reunify the family were required pursuant to § 43-283.01.

## IV. ANALYSIS

### 1. Standard of Review

In an appeal from an order terminating parental rights, an appellate court tries factual questions de novo on the record. Appellate review is independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004); *In re Interest of Dylan Z.*, 13 Neb. App. 586, 697 N.W.2d 707 (2005).

### 2. TERMINATION OF PARENTAL RIGHTS

Natural parents have a fundamental liberty interest in the care, custody, and management of their child. See *In re Interest of Mainor T. & Estela T., supra.* That interest is a natural right, subject only to the paramount concern of the public in protecting the rights of the child. See *id.* In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Stacey D. & Shannon D.*, 12 Neb. App. 707, 684 N.W.2d 594 (2004).

In the present case, the juvenile court held that the State failed to prove, by clear and convincing evidence, the grounds for parental termination enumerated in § 43-292(1) and (2). The juvenile court also held that termination of Christopher's parental rights was not in Deztiny's best interests and that the State was required to make reasonable efforts to reunify Christopher and Deztiny. We conclude that Christopher's parental rights should not be terminated.

### (a) Abandonment Under § 43-292(1)

The State asserts that the juvenile court erred in failing to find that Christopher abandoned Deztiny pursuant to § 43-292(1). At the 2006 hearing, the State argued that Christopher failed to show a continuing parental interest, that Christopher failed to timely intervene and secure visitation, and that Christopher failed to support Deztiny. We affirm the juvenile court's finding that Christopher did not abandon Deztiny.

Pursuant to § 43-292(1), a court may terminate parental rights between the parents and juvenile when the court finds such action to be in the best interests of the juvenile and when parents have abandoned the juvenile for 6 or more months immediately prior to the filing of the petition.

For purposes of § 43-292(1), abandonment has been described as a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and opportunity for the display of parental affection for the child. *In re Interest of Dylan Z., supra.* See *In re Interest of Crystal C.*, 12 Neb. App. 458, 676 N.W.2d 378 (2004). Under § 43-292(1), parental intent is a question of fact and may

be determined by circumstantial evidence. See *In re Interest of Sunshine A. et al.*, 258 Neb. 148, 602 N.W.2d 452 (1999). When analyzing a parent's intent to abandon, § 43-292(1) requires us to direct our inquiry to the 6 months immediately preceding the filing of the petition. See *In re Interest of Crystal C., supra* (defendant did not abandon his child despite being absent for approximately 5 months).

In the present case, the crucial 6-month period runs from February to August 2005. When Christopher spoke with Nietfeld, a DHHS caseworker, on May 16, Christopher inquired about visitation and custody. On June 30, he signed an affidavit acknowledging that he had adequate means and housing in which to provide for Deztiny. On August 16, the court granted Christopher supervised visitation with Deztiny.

The record also supports the juvenile court's finding that Christopher did not act with an intent to abandon Deztiny even though he failed to intervene between February 2004 and May 2005. In *In re Interest of Dylan Z.*, 13 Neb. App. 586, 697 N.W.2d 707 (2005), we held that the father's lack of contact with his minor child was directly attributable to his lack of knowledge that he was the child's father. Because "DHHS and the protection safety worker made no attempts to contact [the father] in the relevant 6-month time period," we concluded that the father's failure to connect with his child was "due to just cause and excuse and not to indifference or intentional abandonment." *Id.* at 598, 697 N.W.2d at 719.

In the present case, Christopher did not contact DHHS between the months of February 2004 and May 2005. When asked why he did not actively pursue contact with Deztiny during that time, Christopher testified that he was told the visitation agency would contact him. He testified that when no one did so, he left messages at DHHS but his calls went unreturned. Nietfeld testified that it was possible DHHS had received, but failed to respond to, Christopher's messages. She stated that she did not think DHHS had a procedure in regard to telephone messages. She testified that although those with DHHS "try to return phone calls to the best of our ability," she did not think there is "actually a policy." The record also indicates that no one informed Christopher that Deztiny's case had been transferred

to Nietfeld, nor did anyone provide Christopher with any information of how to contact Nietfeld. Similar to the situation in *In re Interest of Dylan Z., supra*, in the present case, Christopher's lack of contact was based on his lack of knowledge. As such, because DHHS failed to contact Christopher, his lack of action does not indicate indifference or intentional abandonment.

Furthermore, the record shows that DHHS did not provide Christopher with the customary information on how to intervene. Contrary to standard DHHS practice, Bigham engaged Christopher in only one conversation concerning intervention, and Nietfeld did not provide followup information. We will not excuse a parent's unnecessary or unreasonable delay in intervening; however, Christopher's failure to intervene, when he was provided with substandard information, does not constitute abandonment.

Finally, Christopher's providing child support between February and August 2005 shows he did not intend to abandon Deztiny. Although Christopher has a history of irregular child support payments, the record indicates that during the 6 months immediately preceding the filing of the petition, Christopher exceeded his child support obligation of $50 per month and paid $372.48.

The State argues that Christopher's implementation of an automatic withdrawal payment process for child support constitutes a token effort that "should not change the fact that he abandoned [Deztiny]." Brief for appellant at 23. We disagree. Christopher's availing himself to an efficient and effective procedure such as this does not constitute a token effort, nor does it somehow negatively impact his act of supporting his daughter. See *In re Interest of Z.D.D. and N.J.D.*, 230 Neb. 236, 430 N.W.2d 552 (1988).

We conclude that the State failed to show clear and convincing evidence that Christopher intended to abandon Deztiny in the 6 months preceding August 18, 2005. Christopher actively sought custody and paid child support during the crucial 6 months. Additionally, his failure to immediately seek intervention was due to just cause. As such, we affirm the juvenile court's finding that Christopher's parental rights should not be terminated pursuant to § 43-292(1).

### (b) Neglect Under § 43-292(2)

The State argues that Christopher neglected Deztiny because he failed to provide continual parental care and because he had a history of criminal convictions. We find that the juvenile court did not err in failing to terminate Christopher's parental rights under § 43-292(2).

Under § 43-292(2), the court may terminate the rights between a parent and juvenile when the court finds such action to be in the best interests of the juvenile and when the parents have substantially and continuously or repeatedly neglected and refused to give the juvenile necessary parental care and protection. The Nebraska Supreme Court has held that a parent's incarceration may be considered along with other factors in determining whether parental rights can be terminated based on neglect. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999).

Christopher's history of criminal conduct does not rise to the level of neglect, because Andrea cared for Deztiny during Christopher's incarceration and because there was no evidence that the convictions adversely affected Deztiny. In *In re Interest of Kalie W., supra*, the court sentenced the father to a jail term of 5 to 8 years. After examining how the incarceration affected the father's ability to provide for his child, the court concluded that the incarceration constituted neglect, because the father was unable to provide for his child's needs.

Unlike the factual background of *In re Interest of Kalie W.*, in the present case, Christopher served only 4 months in jail, and during that time, Andrea provided adequate care for Deztiny. Additionally, since 2000, no criminal or child neglect charges have been filed against Christopher. At the time of the 2006 termination hearing, Christopher had lived with his fiance and her children in the household for 6 years without any reported problems. We conclude that Christopher's criminal history does not constitute neglect.

Additionally, Christopher has not refused to provide parental care and has improved his parenting skills. This court has held that "the law does not require perfection of a parent. Instead, we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child." *In*

*re Interest of Crystal C.*, 12 Neb. App. 458, 465, 676 N.W.2d 378, 384 (2004).

In the present case, Christopher has shown continual care for Deztiny. Christopher testified that he was present for her birth, baptism, and confirmation. After his relationship with Andrea ended, he cared for Deztiny when Andrea temporarily left her with him. In 2001, he sought court-ordered visitation. In 2002, he was ordered to pay child support, and he began paying his obligation in 2003. Although at the time of the 2006 termination hearing Christopher had an arrears balance of $394.06 plus interest, he had paid a total of $1,822.03 and was continuing to pay child support. In 2004, Christopher contacted DHHS upon learning of the removal of Deztiny from Andrea's custody, and on that same day, Christopher provided the requisite paperwork to DHHS. He attended the February 2004 hearing and informed the judge he intended to intervene. He attempted to contact DHHS between 2004 and 2005, and after he spoke with DHHS caseworker Nietfeld in May 2005, he immediately began the process for obtaining visitation. Since May 2005, Christopher has obtained supervised visitation, has regularly visited and provided Deztiny with age-appropriate games, and has missed only four visits.

Christopher's history does not establish a pattern of abuse, nor does the record show that Christopher refused to provide parental care. We affirm the juvenile court's finding that Christopher did not neglect Deztiny pursuant to § 43-292(2).

### (c) Best Interests

The State asserts that terminating Christopher's parental rights would be in Deztiny's best interests. Although the State failed to prove that Deztiny comes within the meaning of § 43-292(1) or (2), it did successfully prove she came within the meaning of § 43-292(7). We must now turn to whether terminating Christopher's parental rights is in Deztiny's best interests.

Under § 43-292, in order to terminate a parent's natural rights to the custody of his or her child, the State first must prove by clear and convincing evidence that at least 1 of the 10 subsections in that statute applies. Next, the State must prove by clear and convincing evidence that termination of parental rights would be

in the child's best interests. See *In re Interest of A.C.*, 239 Neb. 734, 478 N.W.2d 1 (1991). As we stated in *In re Interest of Crystal C.*, 12 Neb. App. at 465, 676 N.W.2d at 384, "we should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child."

Termination of Christopher's parental rights is not in Deztiny's best interests. First, Christopher is working to improve his parenting skills. At the time of the 2006 termination hearing, he was enrolled in parenting classes and had completed 2 weeks of the program. His fiance testified that she and Christopher have "a co-parenting arrangement" and that she has no concerns at all in regard to him parenting her children. She described Christopher's parenting as "very patient, very loving," "very connected with the children," and "hands on." She testified that Christopher is a Cub Scout leader, assists with the children's homework, and is involved in "all of their activities."

Second, Christopher is working to improve his relationship with Deztiny. Since his contact with DHHS in May 2005, he has regularly visited Deztiny. Additionally, Christopher is currently paying child support.

Third, Christopher is working to integrate Deztiny into his and his fiance's family. Christopher's fiance testified that Deztiny "fits right in" with her children. Her twin boys and Deztiny are the same age and have come to "know each other very well over the years." She testified that they "consider themselves brothers and sisters." Deztiny and Christopher's fiance's children are in religious education classes together and see each other every week.

A parent's fundamental liberty interest in their children is subject only to the public's paramount concern in protecting that child's rights. See *In re Interest of Mainor T. & Estela T.*, 267 Neb. 232, 674 N.W.2d 442 (2004). In the present case, we find no paramount concern that outweighs Christopher's fundamental interest in parenting. We affirm the juvenile court's finding that terminating Christopher's parental rights is not in Deztiny's best interests.

(d) Reasonable Efforts Under § 43-283.01

■ The State asserts that the juvenile court erred in requiring reasonable efforts to reunify and preserve the family, because

Christopher "abandoned" Deztiny. Pursuant to § 43-283.01(4)(a), reasonable efforts to preserve and reunify the family *are not necessary* if a court of competent jurisdiction has determined that the parent of the juvenile has subjected the juvenile to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse. Because we have already concluded in our discussion above that Christopher did not abandon Deztiny, we find the State's final assertion of error to be without merit.

## V. CONCLUSION

We conclude that the juvenile court did not err in failing to terminate Christopher's parental rights under § 43-292(1) and (2), because the State failed to prove that Christopher abandoned or neglected Deztiny. We conclude that the juvenile court did not err in finding that termination of Christopher's parental rights is not in Deztiny's best interests or in determining that the State failed to prove that reasonable efforts were not necessary.

AFFIRMED.