17 Neb. App. 645
IN RE INTEREST OF CHANCE J., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, Appellee,
v.
ANDREW J., Appellant.
No. A-08-962.
Court of Appeals of Nebraska.
Filed June 2, 2009.
Patrick A. Campagna and Justin A. Roberts, Senior Certified Law Student, of Lustgarten & Roberts, P.C., L.L.O., for appellant.
Donald W. Kleine, Douglas County Attorney, Jennifer Chrystal-Clark, and Carolyn H. Curry, Senior Certified Law Student, for appellee.
INBODY, Chief Judge, and IRWIN and SIEVERS, Judges.
PER CURIAM.

I. INTRODUCTION
Andrew J. appeals the Douglas County Separate Juvenile Court's termination of his parental rights to Chance J. The juvenile court terminated Andrew's parental rights pursuant to Neb. Rev. Stat. § 43-292(1), (2), and (9) (Reissue 2008). For the following reasons, we reverse, and remand for further proceedings.

II. STATEMENT OF FACTS

1. BACKGROUND OF CHANCE'S MOTHER
On April 17, 2006, Miranda J. gave birth to Chance. In June 2007, the State initiated juvenile proceedings, alleging that Chance came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2004). Chance was removed from Miranda's home and placed with a foster family. On February 14, 2008, the State filed a motion to terminate Miranda's parental rights. After a hearing, the juvenile court found by clear and convincing evidence that Chance was a child within § 43-292(1), (2), and (9) and that it was in Chance's best interests that Miranda's parental rights be terminated. Miranda appealed to this court in case No. A-08-619, and we subsequently affirmed the juvenile court's termination of Miranda's parental rights in a memorandum opinion filed on October 28, 2008.

2. BACKGROUND OF CHANCE'S FATHER
Miranda married Chance's father, Andrew, in Omaha, Nebraska, on February 6, 2002. In 2004, Miranda and Andrew moved to Bowling Green, Kentucky, where they resided together until approximately June or July 2005. Andrew testified that the two separated because he found out Miranda was prostituting and using drugs and that he did not see her again until April 2006, when Andrew's grandmother, from Omaha, contacted Andrew and informed him that Miranda was going to have a baby. To determine whether the baby was his child, Andrew traveled from Kentucky to the hospital in California where Miranda was scheduled to give birth.
Andrew explained that after Chance was born, the hospital room atmosphere was "awkward," because when a nurse brought the baby to him, "the baby was white, had blue eyes, and red hair." Miranda asked what was wrong and, when she saw Chance, indicated that Chance must have been "'a trick's baby.'" Because Andrew is black, he believed that Chance was not his child and returned to Kentucky. There is no father's name listed on Chance's birth certificate.

3. CHANCE'S BACKGROUND
At the time of trial, Chance was nearly 2½ years old. When juvenile proceedings were first initiated, Chance was placed with a licensed foster parent for approximately 6 months. At Andrew's termination hearing, this foster parent testified that when she received Chance, he was about 1 year old and she believed he was delayed in his development because he could not walk. She testified that Amy Watson, the Department of Health and Human Services (DHHS) caseworker, told her Andrew was Chance's father, but that in the 6 months of placement in that foster home, there were no visitations and no contact from Andrew.
Chance was then transferred to a second foster home, where he has remained. Chance's second foster mother testified that Chance had been with her family for nearly a year. She testified that she believed Chance was developmentally delayed when he came to her home and that, at 18 months old, Chance was barely walking, was unable to communicate, and "just sat there." She described Chance as not interacting well, including not wanting to be held or touched. The second foster mother was concerned about Chance's behavior and quit her job to stay at home with him, explaining that he was afraid to be at daycare. She took Chance to a pediatric specialist to test for autism and also to the Munroe-Meyer Institute in Omaha. She also initiated testing with Omaha Public Schools and secured services for Chance, such as early childhood development and speech therapy. The service providers come to Chance's second foster home and also to Chance's daycare to work with him daily. She testified that Chance is still "delayed," but has adjusted very well, and is now walking, talking, and riding bikes.
Chance's second foster mother explained that Chance has had no visitation with Andrew and has not received any form of contact from him. In late July 2008, she was instructed that Chance would be having visitation with Andrew, but the visitation never took place and the second foster mother was never contacted. She testified that she and her husband would like to adopt Chance if Andrew's parental rights were terminated.

4. LOCATING CHANCE'S FATHER
In June 2007, when Miranda and Chance became involved in juvenile proceedings, a DHHS initial assessment worker, Kris Kircher, was assigned to Chance. At the termination hearing for Andrew, Kircher testified that from the earliest involvement with DHHS, Miranda had consistently informed her that Andrew was Chance's father. Kircher, through Miranda, child support data bases, and department of corrections Web sites, was able to find three addresses for Andrew, to which Kircher sent letters on June 4, 2007, informing Andrew that he was the alleged father of Chance and that a juvenile case had been filed. The letters included the case docket number, Miranda's name, and contact telephone numbers. One of the three letters was sent to Andrew at an address on Richland Drive in Bowling Green. Andrew testified that he resided at this address during this time, but received no such letter. Kircher testified that the letters were sent by certified mail, but no evidence was adduced that the letters had been either received or returned. Kircher explained that she had not attempted to contact Andrew by telephone, although she had been present at a visitation wherein Miranda claimed to be on the telephone with Andrew discussing Chance. No evidence was ever presented that Andrew was actually on the telephone during that call.
Shortly thereafter, the case was transferred to the DHHS caseworker, Watson, who testified that she also was involved in the process of locating Andrew. Watson explained that, in such a case where the parent's whereabouts are unknown, she first checks to see what the initial assessment worker has completed and then conducts her own investigation, which includes looking for addresses and telephone numbers, talking with family members, and Internet research. Watson testified that she knew Andrew was Chance's legal father from the marriage certificate of Andrew and Miranda. According to Watson, she did not send out letters to the possible known addresses, because Kircher had recently done that, so Watson double-checked all the information, while searching for any additional information.
Miranda supplied Watson with a telephone number for Andrew, and Watson testified that she immediately tried to contact Andrew several times and then again "every couple of months" until February 2008. Watson sent Andrew two letters on February 1, 2008, sending one of the two, again, to the Richland Drive address in Bowling Green. Watson testified that on February 14, she received a voicemail from Andrew stating that he had received her letter and providing a new contact telephone number. Watson called Andrew at the newly provided number and left him a lengthy message, with court dates and telephone numbers, but did not actually talk to Andrew until March 4.
During the conversation on March 4, 2008, Andrew told Watson that he did not believe Chance was his son because of how Chance looked at birth and that Andrew had spoken with Miranda approximately 5 months before. Watson explained to Andrew that under Nebraska law, because he and Miranda were married at the time of Chance's birth, he was considered Chance's legal father. Watson testified that Andrew explained that he had not seen Chance since birth, but had talked with Miranda "'all the time'" about Chance and how he looked. Andrew told Watson, again, that he did not think Chance was his, because Andrew is black, but would "take him" if Chance was his child. Watson indicated that she gave Andrew several referrals for DNA testing and several contact numbers for herself, as well as child support agencies. Andrew did not ask to have any contact with the child at that time, but continued to maintain contact with Watson over the following months.
In late April 2008, genetic testing was completed, indicating that Andrew was Chance's father. Watson testified that the first time she and Andrew discussed visitation with Chance was near the end of June 2008, when she asked him about visitation. As previously mentioned, visitation was scheduled between Chance and Andrew in July. Andrew drove to Nebraska from Kentucky, but the visitation did not occur. Trial testimony from Watson, Andrew, and Chance's second foster mother indicates that a series of miscommunications between the parties resulted in the visitation's never taking place.

5. JUVENILE PROCEEDINGS
On February 14, 2008, the State filed a supplemental petition alleging that Chance was within the meaning of §§ 43-247(3)(a) (Cum. Supp. 2006) and 43-292(1), (2), and (9), by virtue of abandonment by Andrew for reason of no contact or support in the previous 6 months, and that it was in the best interests of Chance that Andrew's parental rights be terminated.
The adjudication hearing on the supplemental petition was held on August 4, 2008. The State called Chance's foster parents, the initial assessment worker, and the current caseworker. The caseworker, Watson, testified that she believed it was in Chance's best interests that Andrew's parental rights be terminated. Watson explained that in making such a determination, she uses several factors, such as the legal reasons, efforts to locate and work with the parent, services done voluntarily and services ordered, length of time in foster care, permanency options and the care the child is currently receiving, and the long-term emotional, social, educational, and psychological needs of the child. Watson testified that in Chance's case, Chance is stable and has improved with the current foster placement.
At the hearing, Andrew testified in his own behalf. Andrew testified that he still lives in Bowling Green and has been employed with the "Lincoln Way Agency" for 1 year. Andrew testified that he was not previously married, but does have three older children in their twenties. Andrew testified that he raised those children on his own, after their mother left them in the care of Andrew. Andrew testified that he was still married to Miranda and that after the two separated, he traveled to California to see Miranda give birth to Chance. Andrew described the atmosphere in the hospital room as "awkward" because when the nurse gave him the child, Chance was "white, had blue eyes, and red hair." Andrew explained that when Miranda saw the baby, she responded by saying that "'[i]t was a trick's baby.'" Andrew testified that, thus, since he is black, he believed Chance was not his child.
Andrew testified that Miranda did not keep in contact with him after Chance's birth and Andrew's return to Bowling Green. Specifically, Andrew maintained that he had no contact with Miranda until May 2008, even though there was testimony presented that Andrew had told Watson he had spoken with Miranda in the months prior to the petition's being filed. Andrew testified that even though he was living at one of the addresses that the certified letters had originally been sent in June 2007, he did not receive any such letter. Andrew further explained that until the February 1, 2008, letter from Watson, he knew nothing of the situation involving Chance. Andrew testified that he was never informed that he could send cards, letters, or gifts to Chance and was never offered any type of visitation.
On cross-examination, Andrew testified that once he saw Chance, after birth, he did not believe that Chance was his son and made no effort to try and determine whether he was not in fact the father. Andrew testified as follows:
Q. Okay. So during that time frame up until you received  allegedly received the second letter from the Department, you didn't make any inquiry during that time to whether or not Chance was your son?
A. Right.
Q. So while Chance was in foster care and you were in Bowling Green, you kept on thinking Chance was someone else's child; correct?
A. Yes, I did.
Q. Now, was the only reason why you didn't think that Chance was your son was because he was white? A. Yes, because he was white.
Q. So if Chance was born black you would have made some effort to try to be his dad at that time; correct?
A. Not without a DNA test I wouldn't.
Q. So are you saying if the child was born darker at birth, you would have actually made an effort in regards to trying to find out for DNA testing, you would have actually thought of that?
A. Yes, I would have.
However, Andrew testified that since discovering that Chance was his son, in April 2008, he has made continuing efforts to establish a home for Chance, including requesting that a home study be completed and keeping in close contact with Watson. Andrew testified that he would do "whatever it takes" in order to provide a home and be a parent to Chance.
On August 8, 2008, the juvenile court issued an order determining that Chance was a child within the meaning of §§ 43-247(3)(a) (Reissue 2008) and 43-292(1), (2), and (9) and that it was in the best interests of Chance that Andrew's parental rights be terminated. Andrew has timely appealed.

III. ASSIGNMENTS OF ERROR
Andrew has no assignments of error, but argues that the juvenile court erred in (1) finding that statutory grounds for termination of his parental rights were proved by clear and convincing evidence, (2) finding that reasonable efforts under Neb. Rev. Stat. § 43-283.01 (Reissue 2008) were not required, and (3) finding that termination of Andrew's parental rights was in Chance's best interests.

IV. STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and the appellate court is required to reach a conclusion independent of the juvenile court's findings. In re Interest of Tyler F., 276 Neb. 527, 755 N.W.2d 360 (2008); In re Interest of Jeffrey K., 273 Neb. 239, 728 N.W.2d 606 (2007). When the evidence is in conflict, however, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. In re Interest of Tyler F., supra.

V. ANALYSIS

1. GROUNDS FOR TERMINATION OF PARENTAL RIGHTS
The right of parents to maintain custody of their child is a natural right, subject only to the paramount interest which the public has in the protection of the rights of the child. In re Interest of Mainor T. & Estela T., 267 Neb. 232, 674 N.W.2d 442 (2004); In re Interest of Dylan Z., 13 Neb. App. 586, 697 N.W.2d 707 (2005). The fundamental liberty interest of natural parents in the care, custody, and management of their child is afforded due process protection, and state intervention to terminate the parent-child relationship must be accomplished by fundamentally fair procedures meeting the requisites of the Due Process Clause. See In re Interest of Mainor T. & Estela T., supra.
Before parental rights may be terminated, the evidence must clearly and convincingly establish the existence of one or more of the statutory grounds permitting termination and that termination is in the juvenile's best interests. In re Interest of Destiny A. et al., 274 Neb. 713, 742 N.W.2d 758 (2007).
Andrew argues that the juvenile court erred in finding that statutory grounds for termination of his parental rights pursuant to § 43-292(1), (2), and (9) were proved by clear and convincing evidence.

(a) Abandonment
For purposes of § 43-292(1), abandonment has been described as a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and opportunity for the display of parental affection for the child. In re Interest of Deztiny C., 15 Neb. App. 179, 723 N.W.2d 652 (2006).
Section 43-292(1) further provides that there are grounds for termination of parental rights when a parent has "abandoned the juvenile for six months or more immediately prior to the filing of the petition." The time period for abandonment in this section is determined by counting back 6 months from the date the juvenile petition was filed. See In re Interest of Crystal C., 12 Neb. App. 458, 676 N.W.2d 378 (2004). The supplemental petition in this case was filed on February 14, 2008, which is counted back 6 months to August 14, 2007.
The record clearly shows that Andrew had no contact with Chance during this 6-month time period, from August 14, 2007, to February 14, 2008. In fact, Andrew's only contact with Chance, ever, was immediately following his birth in April 2006. The State's witnesses, including Chance's two foster mothers and two DHHS workers involved, all corroborated the fact that Andrew had no contact with Chance during this time, or at any time, prior to or following the requisite 6-month time period. The State's witnesses further testified that Andrew has not provided Chance any financial support, and also has not provided any cards, gifts, or letters for Chance. Andrew himself admitted to having no contact with Chance after the hospital visit following Chance's birth.
However, Andrew argues that he did not intend to abandon Chance and had "a just cause or excuse for withholding his presence," because he was not aware that he was Chance's father. Brief for appellant at 11. Andrew argues that this situation is akin to that of the father in In re Interest of Dylan Z., 13 Neb. App. 586, 697 N.W.2d 707 (2005), in which this court held that the father's lack of contact with his minor child was directly attributable to his lack of knowledge that he was the child's father. We concluded that the father's failure to connect with his child was due to just cause and excuse because DHHS and the protection safety worker made no attempts to contact the father during the relevant 6-month time period.
The facts of In re Interest of Dylan Z., supra, indicate that the parents of Dylan Z. were not married, they were not together when Dylan was born, the father was not present at Dylan's birth, the father was not named on the birth certificate, and Dylan's father suspected Dylan's mother of being involved with another man around the time of conception. The facts also indicate that the DHHS protection safety worker was aware of the name of Dylan's father for 2 years before the supplemental petition was filed and made only two attempts to contact the father, not within the requisite 6-month time period. Dylan's father presented evidence that he was unaware that he was Dylan's father until he was served with the petition.
While the facts in this case differ somewhat from those in In re Interest of Dylan Z. because, unlike Dylan's parents, Miranda and Andrew were married at the time of Chance's birth and remained married during the juvenile proceedings, the issue remain the same, whether or not Andrew had the intent to abandon Chance.
Upon our de novo review of the record, we find that Andrew did not have the intent to abandon his child. Clearly, Andrew abandoned a child, inasmuch as he was present for the birth of a child by his wife; however, the circumstances surrounding the birth indicated to Andrew that he was not Chance's father.
The record indicates that Miranda had been using drugs and prostituting for several months before and after she left Andrew in Kentucky. Miranda disappeared from Andrew's life, and Andrew had no idea where she was or what she was doing until approximately 9 to 10 months after the two separated, when Andrew learned that Miranda was giving birth to a child and subsequently traveled to California to see the birth. Upon viewing Chance after the birth, Andrew did not believe the child was his, the idea of which was confirmed when Miranda indicated that Chance was "`a trick's baby.'" Miranda listed no name for Chance's father on the birth certificate, and Andrew returned to Kentucky.
There is nothing in the record to indicate that Andrew had actual knowledge that Chance was his child until the genetic testing was completed in April 2008; thus, Andrew could not have intentionally abandoned his child (Chance) for 6 months or more immediately prior to the filing of the petition, as required by § 43-292(1), because he did not know Chance was his child. Moreover, despite being legally married to Miranda at the time of Chance's birth, there were abundant reasons for Andrew to reasonably believe that he had not fathered the child, including the child's physical appearance and the mother's statement that the baby was "`a trick's baby.'" The record indicates that once Andrew learned Chance was his child, Andrew made attempts to secure visitation with Chance, and that Andrew wanted to be a part of Chance's life.
Therefore, because we conclude that the record lacks clear and convincing evidence to support a finding that Andrew intentionally abandoned his child (Chance), we find that the juvenile court erred in finding that this statutory ground was proved by clear and convincing evidence.

(b) Neglect
Neglect, in the context of § 43-292(2), requires that the parents "substantially and continuously or repeatedly neglected and refused to give the juvenile . . . necessary parental care and protection." We interpret § 43-292(2) to be referring to a parent's obligation to care for his or her child.
The record in this case fails to establish by clear and convincing evidence that Andrew substantially and continuously or repeatedly neglected and refused to give his child (Chance) the necessary parental care and protection. The record demonstrates that Andrew's failure to parent Chance was not due to indifference or intention to abandon or neglect Chance, but a result of Andrew's lack of knowledge that Chance was his child. Further, the record does not support a finding by clear and convincing evidence that Andrew refused to give Chance the necessary parental care and protection, because once Andrew knew Chance was his child, he immediately took steps to become involved with Chance as his father.
Thus, the juvenile court also erred in determining that this statutory ground for termination of Andrew's parental rights was proved by clear and convincing evidence.

(c) Aggravated Circumstance
Finally, § 43-292(9) provides statutory grounds for termination of parental rights if the juvenile court finds that the parent has subjected the child to "aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse." The aggravated circumstance at issue in this case is abandonment. As noted above, we concluded that the juvenile court erred in finding that the State proved by clear and convincing evidence that Andrew had abandoned Chance in accordance with § 43-292(1). Therefore, it also follows that the record does not clearly and convincingly demonstrate that Andrew subjected Chance to the aggravated circumstance of abandonment in § 43-292(9), and the juvenile court erred in finding that this statutory ground for termination was proved by clear and convincing evidence.

2. REASONABLE EFFORTS TO PRESERVE AND REUNIFY
Andrew next argues that the juvenile court erred in failing to require reasonable efforts pursuant to § 43-283.01 to preserve and reunify the family, because the juvenile court erroneously found that Andrew had abandoned Chance.
Section 43-283.01(4)(a) excuses reasonable efforts when the parent "has subjected the juvenile to aggravated circumstances, including, but not limited to, abandonment." In accordance with the above findings that the State failed to prove by clear and convincing evidence any of the alleged statutory grounds for parental termination, we find the juvenile court also erred in concluding that reasonable efforts were not required.

3. BEST INTERESTS OF CHILD
Finally, Andrew contends that it is not in Chance's best interests to terminate Andrew's parental rights. Andrew argues that he has been employed for 1 year at the Lincoln Way Agency, has already raised three children, and has made repeated trips to Omaha to attend hearings and attempt visitation and that there is no evidence, beyond the opinion of Watson, to suggest that termination of his parental rights is appropriate. In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. In re Interest of Dylan Z., 13 Neb. App. 586, 697 N.W.2d 707 (2005).
The only evidence in the record which suggests that termination of Andrew's rights would be in Chance's best interests is the testimony of Chance's caseworker, Watson. Watson testified that it was her opinion, looking at the case as a whole, including Andrew's lack of involvement, Chance's special needs, and Chance's current situation, that it was in Chance's best interests that Andrew's parental rights be terminated. Chance's second foster mother had worked with Watson and testified that Chance has several special needs concerning his developmental delays which require significant time and appropriate services. While Andrew did testify that until hearing the testimony of Chance's second foster mother, he did not know Chance had any special needs, there was no evidence presented that Andrew was unable or unwilling to provide for any of Andrew's special needs.
Watson also testified that her opinion was partly based on Chance's current situation, inasmuch as he had been placed with a caring and involved foster family who was willing to have permanent placement of Chance. The evidence presented at the trial indicates that Chance's second foster mother has provided appropriate care and that the foster home is a suitable placement for Chance; however, these factors do not support a finding that termination of Andrew's parental rights is in Chance's best interests. Thus, upon our de novo review of the record, we find that the record does not support the juvenile court's finding that termination of Andrew's parental rights is in Chance's best interests.

VI. CONCLUSION
Upon our de novo review of the record, we conclude the State failed to present sufficient evidence to support a finding by clear and convincing evidence that Andrew's parental rights should be terminated, that reasonable efforts were not required, and that termination of Andrew's parental rights is in Chance's best interests. Therefore, we reverse, and remand to the juvenile court for further proceedings.
REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.
INBODY, Chief Judge, dissenting.
I must respectfully dissent from the majority's opinion reversing the juvenile court's order which terminated the parental rights of Andrew and remanding for further proceedings. The majority opines that although Andrew abandoned a child in this case, he did not intend to abandon his child, and that therefore, his parental rights should not be terminated. The majority relies on In re Interest of Dylan Z., 13 Neb. App. 586, 697 N.W.2d 707 (2005), in reaching its decision by focusing on Andrew's intent to abandon Chance. The majority reasons that, because Miranda told Andrew that Chance was "'a trick's baby,'" in combination with the physical features of Chance, Andrew did not intentionally abandon his child, not unlike the father in In re Interest of Dylan Z.
However, a closer reading of In re Interest of Dylan Z. shows a different set of facts from those presented in the present case. In In re Interest of Dylan Z., Dylan's parents were not married or in a relationship when Dylan was born and the alleged father was not present at Dylan's birth, or anytime thereafter. Conversely, in the present case, Andrew and Miranda were, and still are, legally married. The record contains the marriage certificate for Andrew and Miranda, who were married in Omaha, Nebraska, on February 6, 2002, and those facts were not disputed. Andrew and Miranda's marriage creates a rebuttable presumption that a child born of a marriage is legitimate, unless otherwise decreed by the court. See Neb. Rev. Stat. § 42-377 (Reissue 2008). The presumed legitimacy of a child born in wedlock may not be rebutted by the testimony or declaration of a parent. Ford v. Ford, 191 Neb. 548, 216 N.W.2d 176 (1974); Cavanaugh v. deBaudiniere, 1 Neb. App. 204, 493 N.W.2d 197 (1992). Thus, Miranda's statement to Andrew that Chance must be "'a trick's baby'" (which statement is relied upon by the majority) is not enough to clearly and convincingly rebut the presumption that Chance was Andrew's child.
Also distinguishable from In re Interest of Dylan Z. is the testimony by several witnesses, including Andrew, that he had been informed of Chance's birth and subsequently traveled to California to witness the birth. However, Andrew felt that because he is a black man and Chance was "born white, with red hair and blue eyes . . ., there did not appear to be much further need for discussion" as to Chance and Andrew's relationship. Brief for appellant at 13. Andrew admitted that after Chance was born, Andrew left the hospital and had no further contact with Miranda regarding Chance until Miranda's termination of parental rights hearing in May 2008.
There is nothing in the record to indicate that Andrew did not have the means or opportunity to confirm his suspicions that Chance was not his child while at the hospital or anytime thereafter. Instead, Andrew made a conscious decision to walk out of the hospital room and out of Chance's life. It was not until nearly 3 years later, after DNA testing had been completed, and almost 4 months after the State had filed the petition to terminate his parental rights, that Andrew took any responsibility for Chance. These circumstances clearly amount to abandonment as provided by Neb. Rev. Stat. § 43-292(1) (Reissue 2008). Andrew has intentionally withheld from Chance, without just cause or excuse, his presence, care, love, protection, maintenance, and opportunity for the display of parental affection. See In re Interest of Deztiny C., 15 Neb. App. 179, 723 N.W.2d 652 (2006). Moreover, the record clearly shows that Andrew had no contact from August 14, 2007, through February 14, 2008, which satisfies the requisite 6-month time period for abandonment under § 43-292(1). See In re Interest of Crystal C., 12 Neb. App. 458, 676 N.W.2d 378 (2004).
I also disagree with the majority's conclusion that termination of Andrew's parental rights is not in Chance's best interests. In addition to the abandonment issues discussed above, Chance's second foster mother testified that Chance has several special needs, including developmental delays, and that she has sought to provide Chance the appropriate services for those special needs. Andrew testified that he was unaware Chance had any special needs until hearing the second foster mother's testimony, but thought he could get services for Chance, because "in every state of the United States there is [sic] all types of services for kids with needs." The DHHS caseworker also testified that it was her opinionlooking at the case as a whole, including Andrew's lack of involvement, Chance's special needs, and the stability of Chance's current situationthat it was in Chance's best interests that Andrew's parental rights be terminated.
In my opinion, the outcome reached by the majority leads us down a slippery slope. A married man would be able to abandon a child of the marriage based upon the physical features of a child that are substantially different from his own physical features.
Therefore, under a de novo review of the record, I would find that the evidence in the record clearly and convincingly establishes the existence of statutory grounds permitting termination of Andrew's parental rights, as Chance's presumptive father under § 42-377, and that termination of those rights is in Chance's best interests. See In re Interest of Destiny A. et al., 274 Neb. 713, 742 N.W.2d 758 (2007). Furthermore, because I would find that the juvenile court did not err in finding that Andrew had abandoned Chance pursuant to § 43-292(1), I would conclude that the State was not required to make reasonable efforts to reunify the family pursuant to Neb. Rev. Stat. § 43-283.01 (Reissue 2008).