776 N.W.2d 519 (2009)
279 Neb. 81
In re Interest of CHANCE J., a child under 18 years of age.
State of Nebraska, appellee,
v.
Andrew J., appellant.
No. S-08-962.
Supreme Court of Nebraska.
December 31, 2009.
*521 Patrick A. Campagna and Justin A. Roberts, Senior Certified Law Student, of *522 Lustgarten & Roberts, P.C., L.L.O., Omaha, for appellant.
Donald W. Kleine, Douglas County Attorney, Jennifer Chrystal-Clark, and Carolyn H. Curry, Senior Certified Law Student, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.

NATURE OF CASE
This is an action to terminate the parental rights of Andrew J., the biological father of Chance J. The juvenile court terminated Andrew's parental rights pursuant to Neb.Rev.Stat. § 43-292(1), (2), and (9) (Reissue 2008). A divided panel of the Nebraska Court of Appeals reversed the judgment of the juvenile court, holding that the State failed to present sufficient evidence to support a finding by clear and convincing evidence that Andrew's parental rights should be terminated based on abandonment. The court also determined that reasonable reunification efforts were required and that termination of Andrew's parental rights was not in Chance's best interests.[1] On further review, we conclude that the juvenile court did not err in terminating Andrew's parental rights and reverse the judgment of the Court of Appeals.

BACKGROUND

ANDREW'S MARRIAGE AND BIRTH OF CHANCE J.
Andrew and Miranda J., Chance's mother, were married in Omaha, Nebraska, on February 6, 2002. They left Nebraska and moved to Kentucky in 2004. Eventually, they separated because Miranda was prostituting and using drugs. Less than a year after their separation, Andrew received a telephone call informing him that Miranda was pregnant and scheduled to give birth in California. Andrew traveled from Kentucky, where he lived, to California for the birth.
In April 2006, Miranda gave birth to Chance. Andrew testified that after Chance was born, the hospital room atmosphere was "awkward," because Andrew is African-American, but when a nurse brought the baby to him, "the baby was white, had blue eyes, and red hair." Miranda asked what was wrong and, when she saw Chance, indicated that Chance must have been "`a trick's baby."' Andrew testified that once he saw Chance, he did not believe that Chance was his son and made no further effort to try and determine whether he was Chance's father. At the termination hearing, Andrew was asked whether it concerned him that Chance was with a woman who he knew had a history of prostitution and drug use, and he replied that yes, "anybody with Miranda has always concerned me." Andrew left the hospital and returned to Kentucky.

CHANCE J. IN FOSTER CARE
In June 2007, the State initiated juvenile proceedings against Miranda alleging that Chance came within the meaning of Neb. Rev.Stat. § 43-247(3)(a) (Cum. Supp. 2006). Chance was removed from Miranda's home and placed in foster care, and eventually, Miranda's parental rights were terminated. When juvenile proceedings were first initiated, Chance was placed with a licensed foster parent for approximately 6 months. At Andrew's termination hearing, the first foster parent *523 testified that when she received Chance, he was not developmentally "up to par." She testified that Amy Watson, the Department of Health and Human Services (DHHS) caseworker, told her Andrew was Chance's father, but that in the 6 months of placement in that foster home, there were no visitations and no contact from Andrew.
Chance was then transferred to a second foster home, where he has remained. Chance's second foster mother testified that she believed Chance was developmentally delayed when he came to her home and that, at 18 months old, Chance was barely walking, was unable to communicate, and "just sat there." She described Chance as not interacting well, including not wanting to be held or touched. The second foster mother was concerned about Chance's behavior and quit her job to stay at home with him, explaining that Chance was afraid to be at daycare. She took Chance to a pediatric specialist to test for autism and also to the Munroe-Meyer Institute in Omaha, which specializes in providing services and support for persons with genetic disorders and developmental disabilities. The foster mother also initiated testing with Omaha Public Schools and secured services for Chance, such as early childhood development and speech therapy. The service providers come to Chance's second foster home and also to Chance's daycare to work with him daily. She testified that Chance is still "delayed," but has adjusted well, and is now walking, talking, and riding bikes.
Chance's second foster mother explained that Chance has had no visitation with Andrew and has not received any form of contact from him. In late July 2008, the foster mother was instructed that Chance would be having visitation with Andrew, but the visitation never took place and she was never contacted.

ANDREW'S CONTACT WITH DHHS
When Miranda and Chance first became involved in juvenile proceedings, a DHHS initial assessment worker, Kris Kircher, was assigned to Chance. At Andrew's termination hearing, Kircher testified that from the earliest involvement with DHHS, Miranda had consistently informed her that Andrew was Chance's father. Kircher, through Miranda, child support databases, and federal and state departments of corrections Web sites, was able to find three addresses for Andrew. On June 4, 2007, Kircher sent one letter to each of the three addresses, via certified mail, informing Andrew that he was the alleged father of Chance and that a juvenile case had been filed. The letters were on DHHS letterhead and included the case docket number, Miranda's name, and contact telephone numbers. They advised Andrew to contact an attorney and that a petition to terminate his "parental rights may be filed, due to abandonment." One of the three letters was sent to Andrew at an address on "Richland Drive" in Bowling Green, Kentucky. Andrew testified that he resided at that address during this time, but received no such letter. No evidence was adduced that the letters had been received or returned. Kircher explained that she did not attempt to contact Andrew by telephone, although she was present at a visitation when Miranda claimed to be on the telephone with Andrew discussing Chance.
Shortly thereafter, the case was transferred to a second DHHS caseworker, Watson, who testified that she also was involved in the process of locating Andrew. Watson explained that in such a case where a parent's whereabouts are unknown, she first checks to see what the initial assessment worker has completed and then conducts her own investigation, *524 which includes looking for addresses and telephone numbers, talking with family members, and Internet research. Watson testified that when she received Chance's file, she reviewed the letters Kircher had sent out a couple of weeks before and doublechecked all current addresses within the child support system, the DHHS computer programs, and the Nebraska and Kentucky child support systems. Watson also talked to all possible relatives, as well as Miranda. Watson testified that she knew Andrew was Chance's legal father from the marriage certificate of Andrew and Miranda. According to Watson, she did not initially send out letters to Andrew because Kircher had recently done so.
Miranda supplied Watson with a telephone number for Andrew, and Watson testified that immediately after she received the case, she tried to contact Andrew "[s]everal times" and then again "every couple of months" until February 2008. On February 1, Watson sent Andrew two letters, one again going to the Richland Drive address in Bowling Green. Watson testified that on February 14, she received a voicemail from Andrew stating that he had received her letter and providing a new contact telephone number. Watson called Andrew at the newly provided number and left him a lengthy message, with court dates and telephone numbers, but did not actually talk to Andrew until March 4.
During the conversation on March 4, 2008, Andrew told Watson that he did not believe Chance was his son because of how Chance looked at birth. Watson explained to Andrew that under Nebraska law, because he and Miranda were married at the time of Chance's birth, he was presumed to be Chance's legal father. Watson testified that Andrew explained that he had not seen Chance since birth, but had talked with Miranda "`all the time'" about Chance and how he looked. Andrew told Watson, again, that he did not think Chance was his, but would "take him" if Chance was his child. Watson gave Andrew several referrals for DNA testing and several contact numbers for herself, as well as child support agencies. Andrew did not ask to have any contact with Chance at that time, but continued to maintain contact with Watson over the following months. In April 2008, genetic testing was completed, indicating that Andrew was Chance's father.

JUVENILE PROCEEDINGS
On February 14, 2008, the State filed a supplemental petition alleging that Chance was within the meaning of §§ 43-247(3)(a) and 43-292(1), (2), and (9), by virtue of abandonment by Andrew for reason of no contact or support in the previous 6 months, and that it was in the best interests of Chance that Andrew's parental rights be terminated. The hearing on the supplemental petition was held on August 4, 2008.
Watson testified that she believed it was in Chance's best interests that Andrew's parental rights be terminated. Watson explained that in making such a determination, she uses several factors, such as legal reasons, efforts to locate and work with the parent, services done voluntarily and services ordered, length of time in foster care, permanency options and the care the child is currently receiving, and the long-term emotional, social, educational, and psychological needs of the child. Watson testified that in Chance's case, Chance "has been able to get stable, permanent, love, affection, the education, the speech development, the occupational and physical therapy development that he's needed, and is in a permanent option at this point."
*525 Andrew testified in his own behalf. Andrew testified that he still lives in Bowling Green and has been employed with the "Lincoln Way Agency" for 1 year. Andrew testified that he was not previously married, but does have three older children in their twenties that he raised on his own, after their mother left them in his care. Andrew testified that he was still legally married to Miranda and that Miranda did not keep in contact with him after Chance's birth and Andrew's return to Bowling Green. Specifically, Andrew maintained that he had no contact with Miranda until May 2008, even though there was testimony presented that Andrew had told Watson he had spoken with Miranda in the months prior to the petition's being filed. Andrew further explained that the February 1, 2008, letter from Watson was the first contact he had with DHHS concerning Andrew. Andrew testified that he was never informed that he could send cards, letters, or gifts to Chance and was never offered any type of visitation.
The juvenile court entered an order determining that Chance was a child within the meaning of §§ 43-247(3)(a) and 43-292(1), (2), and (9) and that it was in the best interests of Chance that Andrew's parental rights be terminated. Andrew appealed. The Court of Appeals reversed the order of the juvenile court. The Court of Appeals found that the evidence was insufficient to prove that Andrew's parental rights should be terminated. The court also determined that reasonable efforts to reunify the father and son were required and that termination of Andrew's parental rights was not in Chance's best interests.[2] The State filed a petition for further review, which we granted.

ASSIGNMENTS OF ERROR
In its petition for further review, the State assigns that the Court of Appeals erred in reversing the juvenile court's determinations that (1) the State proved by clear and convincing evidence that Andrew abandoned Chance, (2) reasonable efforts to reunify the family were not required, and (3) termination of Andrew's parental rights was in Chance's best interests.

STANDARD OF REVIEW
Juvenile cases are reviewed de novo on the record, and an appellate court is required to reach a conclusion independent of the juvenile court's findings.[3] However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.[4]

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION OF PARENTAL RIGHTS
The State first argues that the Court of Appeals erred in concluding that there was not clear and convincing evidence that Andrew abandoned Chance under § 43-292(1) and (9). In relevant part, § 43-292 provides:
The court may terminate all parental rights between the parents ... and [a] juvenile when the court finds such action to be in the best interests of the juvenile and it appears by the evidence that one or more of the following conditions exist:

*526 (1) The parents have abandoned the juvenile for six months or more immediately prior to the filing of the petition.
For purposes of § 43-292(1), "abandonment" is a parent's intentionally withholding from a child, without just cause or excuse, the parent's presence, care, love, protection, maintenance, and the opportunity for the display of parental affection for the child.[5]
The question of abandonment is largely one of intent, to be determined in each case from all the facts and circumstances.[6] To prove abandonment, the evidence must clearly and convincingly show that the parent has acted toward the child in a manner evidencing a settled purpose to be rid of all parental obligations and to forgo all parental rights, together with a complete repudiation of parenthood and an abandonment of parental rights and responsibilities.[7] Whether a parent has abandoned a child within the meaning of § 43-292(1) is a question of fact and depends upon parental intent, which may be determined by circumstantial evidence.[8] The time period for abandonment in this section is determined by counting back 6 months from the date the juvenile petition was filed.[9]
In this case, the supplemental petition was filed on February 14, 2008. The crucial time period for our analysis, therefore, is August 14, 2007, through February 14, 2008. The record clearly shows that Andrew had no contact with Chance during this 6-month time period. In fact, Andrew's only pre-petition contact with Chance, ever, was immediately following his birth in April 2006. Both foster mothers and the two DHHS workers involved testified that Andrew had no contact with Chance during the relevant 6-month period, or at any time before or after the 6-month period. Andrew himself admitted to having no pre-petition contact with Chance after April 2006. In addition, Andrew has not provided Chance any financial support and has not provided any cards, gifts, or letters to Chance. In short, the evidence shows a complete abandonment of parental rights and responsibilities.
Given these undisputed facts, the question before us is whether Andrew had just cause or excuse to withhold his presence, care, love, protection, maintenance, and the opportunity for the display of parental affection of Chance. Andrew argues that he had just cause or excuse, because prior to genetic testing, he believed that he was not Chance's father.
In agreeing with Andrew, the Court of Appeals relied on In re Interest of Dylan Z.,[10] in which it had held that a father's lack of contact with his minor child was directly attributable to his lack of knowledge that he was the child's father. In that case, the Court of Appeals concluded that the father's failure to connect with his child was due to just cause and excuse, because DHHS and the protection safety worker made no attempts to contact the father during the relevant 6-month period.[11]
*527 In re Interest of Dylan Z., however, dealt with a significantly different set of circumstances than the situation in the present case. First, Dylan's parents were not married or in a relationship at the time of Dylan's birth. Here, Andrew and Miranda were, even at the time of the hearing on Andrew's parental rights, still legally married. It has long been the law that children born to the parties in a marriage are presumed legitimate until proved otherwise or decreed otherwise by the court.[12] But more importantly, in In re Interest of Dylan Z., Dylan's alleged father was not present at Dylan's birth. Here, Andrew was informed of the birth and traveled to California to witness it.
Andrew testified that after seeing Chance shortly after his birth, Andrew did not believe the child was his. The Court of Appeals concluded that there was nothing in the record to indicate that Andrew had actual knowledge that Chance was his child until the genetic testing was completed in April 2008, and therefore, Andrew could not have intentionally abandoned Chance because he did not know Chance was his child. We conclude, however, that paternal uncertainty based on physical appearance of a child or suspicions of infidelity is not just cause or excuse for abandoning a child born into wedlock, especially when there are ample means to verify one's paternity.
In fact, "just cause or excuse" for a parent's failure to maintain a relationship with a minor child has generally been confined to circumstances that are, at least in part, beyond the control of the parent.[13] But there is nothing in the record in this case indicating that Andrew did not have the means or opportunity to confirm his suspicions that Chance was not his child, at the hospital, or anytime thereafter. Andrew concedes that he did not try to ascertain his paternity or assert any parental interest in Chance, despite the fact that Chance was born of his marriage to Miranda. Only after the State filed a petition to terminate his rights, nearly 3 years after Chance was born, did Andrew attempt to take any responsibility for Chance. The obligations of parenthood cannot be set aside that easily, based on nothing more than mere physical appearance or unconfirmed suspicions. We will not set the bar so low for responsible parental involvement.
We conclude, based on our de novo review of the record, that Andrew has intentionally withheld from Chance, without just cause or excuse, his presence, care, love, protection, maintenance, and opportunity for the display of parental affection. Furthermore, the physical appearance of a child or suspicions of infidelity are not just cause or excuse for abandoning a child born into wedlock. The Court of Appeals erred in concluding that Andrew did not abandon Chance. Because we have concluded that Andrew abandoned Chance within the meaning of § 43-292(1), we need not address Andrew's conduct under § 43-292(9).

REASONABLE EFFORTS NOT REQUIRED
In a related argument, the State contends that the Court of Appeals erred in concluding that reasonable efforts to reunify Andrew and Chance were required. *528 We agree that the Court of Appeals erred in this regard. Reasonable efforts to preserve and reunify a family are required when the State seeks to terminate parental rights under § 43-292(6). But in In re Interest of Hope L. et al.,[14] we recently reaffirmed our holding that reasonable efforts to reunify the family are required under the juvenile code only when termination is sought under § 43-292(6), not when termination is based on other grounds.[15] Here, termination was not sought under § 43-292(6); it was sought under § 43-292(1), (2), and (9), and we have affirmed the court's finding of abandonment under § 43-292(1). Therefore, after a proper finding of abandonment, it was not necessary for the State to make reasonable efforts to reunify this father and child.

BEST INTERESTS OF CHANCE J.
Having concluded that the State met its burden to show the requisite statutory grounds under § 43-292, we move next to the question of whether the termination of Andrew's parental rights is in the best interests of Chance. The State argues that the Court of Appeals erred in reversing the juvenile court's finding that termination of Andrew's parental rights was in the best interests of Chance. Again, we agree.
A court may not properly deprive a parent of the custody of his or her minor child unless the State affirmatively establishes that such parent is unfit to perform the duties imposed by the relationship, or has forfeited that right.[16] It is always the State's burden to prove by clear and convincing evidence that the parent is unfit and that the child's best interests are served by his or her continued removal from parental custody.[17] We have noted that the term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the child's best interests.[18]
The evidence establishes that Andrew has forfeited his parental rights relating to Chance and that termination of Andrew's parental rights is in the best interests of Chance. First, the record clearly shows that Andrew's only pre-petition contact with Chance, ever, was immediately following his birth in April 2006. Andrew has not provided Chance any financial support and has not provided any cards, gifts, or letters to Chance. Andrew's failure to contact Chance, let alone parent him, has caused Chance to be placed in foster care for more than 3½ years.
Chance also has several special needs, including developmental delays that require significant time and appropriate services. Evidence presented at the termination hearing indicates that Chance's second foster mother has provided appropriate care and that the foster home is a suitable placement for Chance. When Chance first came to live with the second foster parent, he was barely walking, was unable to communicate, and "just sat there." In less than a year, Chance has improved. Andrew testified that he was unaware Chance had special needs until hearing the second foster mother's testimony, *529 but thought he could get services for Chance, because "in every state of the United States there is [sic] all types of services for kids with needs." Andrew's lack of knowledge about Chance's needs, and Andrew's unpreparedness to provide for them, demonstrates the consequences of a willful failure to be involved with his son's life.
In addition, Watson testified that in her opinion, it was in Chance's best interests that Andrew's parental rights be terminated. In making that determination, Watson considered Andrew's lack of involvement, Chance's special needs, and the stability of Chance's current situation. Watson placed great emphasis on the fact that Chance has been able to get stable, permanent love and affection; education; speech development; and the occupational and physical therapy that he has needed. While the availability of better circumstances for Chance is in no way dispositive, the attention provided to Chance in his foster home provides a persuasive contrast with Andrew's failure to do the same and demonstrates the value to Chance of stability. We conclude Andrew forfeited his parental rights concerning Chance and terminate Andrew's parental rights.

CONCLUSION
For the foregoing reasons, we reverse the judgment of the Court of Appeals, and remand the cause to the Court of Appeals with directions to affirm the judgment of the juvenile court.
REVERSED AND REMANDED WITH DIRECTIONS.
NOTES
[1] See In re Interest of Chance J., 17 Neb.App. 645, 768 N.W.2d 472 (2009).
[2] See id.
[3] In re Interest of Angelica L. & Daniel L., 277 Neb. 984, 767 N.W.2d 74 (2009).
[4] Id.
[5] In re Interest of Dustin H. et al., 259 Neb. 166, 608 N.W.2d 580 (2000).
[6] See id.
[7] See In re Interest of B.A.G., 235 Neb. 730, 457 N.W.2d 292 (1990).
[8] In re Interest of Dustin H. et al., supra note 5.
[9] In re Interest of Deztiny C., 15 Neb.App. 179, 723 N.W.2d 652 (2006).
[10] In re Interest of Dylan Z., 13 Neb.App. 586, 697 N.W.2d 707 (2005).
[11] See id.
[12] Neb.Rev.Stat. § 42-377 (Reissue 2008).
[13] See, In re Morris, 892 So.2d 739 (La.App. 2005); S.K.L. v. Smith, 480 S.W.2d 119 (Mo. App.1972). See, e.g., In re Interest of Sunshine A. et al., 258 Neb. 148, 602 N.W.2d 452 (1999); In re Interest of L.V., 240 Neb. 404, 482 N.W.2d 250 (1992); In re Interest of K.M.S., 236 Neb. 665, 463 N.W.2d 586 (1990); In re Interest of B.A.G., supra note 7. Compare, e.g., In re Interest of Mainor T. & Estela T., 267 Neb. 232, 674 N.W.2d 442 (2004).
[14] In re Interest of Hope L. et al., 278 Neb. 869, 775 N.W.2d 384 (2009).
[15] See, id.; In re Interest of DeWayne G. & Devon G., 263 Neb. 43, 638 N.W.2d 510 (2002).
[16] Id.
[17] Id.
[18] See In re Interest of Xavier H., 274 Neb. 331, 740 N.W.2d 13 (2007).