IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF MY'KYNG K. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF MY'KYNG K. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MICHAEL K., APPELLANT.

Filed March 15, 2016.     No. A-15-805.

Appeal from the Separate Juvenile Court of Douglas County: CHRISTOPHER KELLY, Judge. Affirmed.

Beau G. Finley, of Finley & Kahler Law Firm, P.C., L.L.O., for appellant.

Donald W. Kleine, Douglas County Attorney, Jennifer C. Clark, and Megan Furey, Senior Certified Law Student, for appellee.

MOORE, Chief Judge, and IRWIN and BISHOP, Judges.

BISHOP, Judge.

Michael K. appeals from the decision of the separate juvenile court of Douglas County terminating his parental rights to his son, My'Kyng K. We affirm.

BACKGROUND

Michael is the biological father of My'Kyng, born in 2012. Andrea D. is My'Kyng's biological mother. Andrea has two other children, Da'Jhawna C. and Quinton C.; Michael is not the father of these two children. Because Da'Jhawna and Quinton are not part of this appeal, they will not be discussed further. There is nothing in our record to reflect whether Michael and Andrea were ever married or that they lived together, and Michael was not named on My'Kyng's birth certificate. My'Kyng was removed from Andrea's custody in June 2013 for reasons that do not

appear in our record, and My'Kyng has been in foster care since that time. Andrea's parental rights to My'Kyng are no longer intact; she either relinquished her rights or had them otherwise terminated in January 2015. We note that pleadings in My'Kyng's case relating to Andrea do not appear in our record.

As will be discussed later, My'Kyng's caseworker was not able to contact Michael until February 2015. It is unclear from our record at what point prior to his contact with the caseworker Michael became aware that he was My'Kyng's father or that My'Kyng was the subject of a juvenile court proceeding. Michael's paternity to My'Kyng was established via genetic testing in March; the DNA Test Report was dated April 1.

On April 23, 2015, the State filed a "Second Supplemental Petition and Terminatiion [sic] of Parental Rights" relating to Michael. The State alleged that My'Kyng was within the meaning of § 43-247(3)(a) by reason of the faults or habits of Michael because: (1) Michael admitted to knowing about the "child protective case" for the minor child; (2) Michael refused to intervene on behalf of the minor child; (3) Michael failed to provide proper parental care and protection to the minor child; and (4) due to the above allegations, said child is at risk of harm. The State also sought to terminate Michael's parental rights to My'Kyng pursuant to Neb. Rev. Stat. § 43-292(2) and (7) (Cum. Supp. 2014). The State alleged that: Michael had substantially and continuously or repeatedly neglected and refused to give My'Kyng, or a sibling, necessary parental care and protection; My'Kyng had been in out-of-home placement for 15 out of the most recent 22 months; and termination was in My'Kyng's best interest. Also on April 23, the State filed an ex parte motion for temporary custody, which was granted by the juvenile court.

At a first appearance, detention/protective custody hearing held on May 4, 2015, Michael appeared with counsel. He denied the allegations in the second supplemental petition and motion for termination of his parental rights, but he did not resist the State's request for continuing protective custody. Michael asked for visitation with My'Kyng; his counsel stated "[t]here has been times when the father has seen him, but that hasn't happened within the last eight months." In its order filed on May 4, the juvenile court ordered that My'Kyng remain in the custody of the Nebraska Department of Health and Human Services (DHHS). The court ordered that Michael should have reasonable rights of supervised visitation and was to participate in "Permanency Mediation" as arranged by DHHS/Nebraska Families Collaborative (NFC). Michael was also ordered to notify the court, all counsel, and DHHS and NFC of any change of address and phone number within 48 hours of such change.

An "Adoption Review" hearing was held on July 7, 2015 (the proceedings of which do not appear in our record). In its order filed on July 8, the juvenile court noted who was present in court; neither Michael nor his counsel were noted as present. Additionally, the hearing and order appear to relate to My'Kyng and his siblings (Da'Jhawna and Quinton). The court ordered Michael to participate in and successfully complete a "Batterer's Intervention" course, undergo an "Initial Diagnostic Interview," and undergo a chemical dependency evaluation. The court also ordered that Michael be allowed reasonable rights of supervised parenting time. A copy of the court's order was served on Michael's counsel via mail.

A hearing on the second supplemental petition and motion for termination of Michael's parental rights was held on July 30, 2015. Michael was not present, but was represented by counsel.

Upon questioning by the court, Michael's counsel stated he did not know why Michael was not present and that Michael was advised of the court date. His counsel asked for a continuance, but the court overruled the motion to continue.

The hearing on the second supplemental petition and motion to terminate Michael's parental rights proceeded. The only witness to testify was Brey Fuhrmann, a family permanency specialist with NFC, who had been My'Kyng's case manager since September 2014.

Fuhrmann testified as follows. My'Kyng became a state ward in June 2013, and had been in foster care since that time. When Fuhrmann took over the case in September 2014, Michael was the alleged father, but had not been established as the father legally or via paternity testing. According to Fuhrmann's review of the case file, the prior caseworker made efforts to locate Michael but was unsuccessful; the caseworker's documentation noted that Michael had applied for utility help using Andrea's address, but Andrea denied he lived there. Fuhrmann had ongoing communication with Andrea from September 2014 until January 2015, and had no contact with Michael at Andrea's residence during that time. Other than a vague statement that Fuhrmann had reason to believe that Michael "may have been" living with Andrea in September 2014, she said she had no reason to believe Michael was living with Andrea after that. When asked what efforts she (Fuhrmann) made to try to notify Michael about his child, she said she had made three attempts per month every month since September to contact Michael. She utilized N-Focus (an agency database) to find addresses and phone numbers for Michael, she called utility districts, checked local jails and prisons to see if he was incarcerated, and tried Facebook messaging (after Andrea showed her how to find Michael on Facebook). Fuhrmann sent Michael a Facebook message once a month beginning in November 2014, but did not receive a response until her fourth message, sent in February 2015. In February, Michael called Fuhrmann the day after she sent him a Facebook message; this was the first contact Fuhrmann ever had with Michael. During the February phone call, Fuhrmann asked Michael if he had received any "prior notification" of the child, and Michael told her he had not. Fuhrmann asked Michael if he would be willing to be involved in the case and if he had known the case was open. Michael disclosed that he was aware that the case had been open (the specific date he became aware was not discussed), and he assured Fuhrmann that "the mother would have been able to take care of it." When Fuhrmann told Michael that the mother's rights were no longer intact, he chose to be involved in the case. Fuhrmann told Michael that he needed to establish paternity and file paperwork in juvenile court for an attorney. She offered to refer him to child support in regards to the paternity test, but Michael did not want the referral because "he did not want to pay a monthly payment." Michael pursued a paternity test on his own in March 2015. The results, which were received into evidence, established that Michael was My'Kyng's father.

During the February 2015 phone call, Fuhrmann provided Michael with her contact information. When she asked Michael where he was residing, "he didn't tell [her] anything." He did give her his phone number, but said it would be changing and was unable to provide her with a new number. Since February, Fuhrmann has had phone contact with Michael four or five times; he initiated contact one or two of those times. When asked if Michael had ever disclosed his whereabouts, Fuhrmann stated he had not. Fuhrmann stated that the last contact she had with Michael was in early June 2015. She said she continued to make efforts to try to get in touch with

him, but that she did not have his contact information. Fuhrmann said she never had an address for Michael.

Since having contact with Michael in February 2015, Fuhrmann had not invited him to attend family team meetings because she had been "unable to schedule a meeting with him." Michael told Fuhrmann his intention was to follow court orders and get custody of his child. Fuhrmann had been unable to set up Michael's initial diagnostic interview, chemical dependency evaluation, or batterer's intervention course because she had not been able to get in touch with him. Fuhrmann stated that she went through the referral process for the permanency mediation and the mediation center contacted Michael; mediation was to take place July 27, but Michael did not attend.

Pursuant to the court's order in May 2015, Michael was allowed to have visitation. Fuhrmann sent a referral for visitation and visits were to start within a week of the referral, but Michael chose not to participate until June 24. Since then, Michael had been consistent with his visitation, which was once a week for two hours; at the time of the hearing, Michael had seen My'Kyng approximately four times.

Fuhrmann testified that based on the length of time the case has been open, the age of the child, and the father's lack of involvement with the case, it was in My'Kyng's best interest to terminate Michael's parental rights.

The juvenile court filed its order on July 30, 2015. The juvenile court found that My'Kyng was a child as defined by § 43-247(3)(a) because he lacked proper parental care by reason of the fault and habits of Michael (but the allegation that Michael refused to intervene on behalf of the minor child was dismissed for insufficient evidence). The juvenile court also terminated Michael's parental rights to My'Kyng pursuant to § 43-292(2) and (7) and found that termination was in the child's best interests. Michael has timely appealed the juvenile court's order.

## ASSIGNMENTS OF ERROR

Michael assigns, summarized, consolidated, and reordered, that the juvenile court erred in: (1) refusing to grant his motion for continuance; (2) finding grounds exist to terminate his parental rights under § 43-292(2) and (7); and (3) finding it was in the child's best interest to terminate his parental rights.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. When the evidence is in conflict, however, an appellate court may give weight to the fact that the lower court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015).

A motion for continuance is addressed to the discretion of the trial court, whose ruling will not be disturbed on appeal in the absence of an abuse of discretion. *Breci v. St. Paul Mercury Ins. Co.*, 288 Neb. 626, 849 N.W.2d 523 (2014).

ANALYSIS

*Motion to Continue.*

Michael asserts that the juvenile court erred in refusing to grant his motion for continuance. Michael did not appear at the termination hearing, and upon questioning by the court, Michael's counsel stated he did not know why Michael was not present and that Michael had been advised of the court date.

Parental physical presence is unnecessary for a hearing to terminate parental rights, provided that the parent has been afforded procedural due process for the hearing to terminate parental rights. *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992). Procedural due process includes notice to the person whose right is affected by the proceeding; reasonable opportunity to refute or defend against the charge or accusation; reasonable opportunity to confront and cross-examine adverse witnesses and present evidence on the charge or accusation; representation by counsel, when such representation is required by the Constitution or statutes; and a hearing before an impartial decisionmaker. *In re Interest of Sir Messiah T. et al.*, 279 Neb. 900, 782 N.W.2d 320 (2010).

In the instant case, Michael had been advised of the court date and, although not physically present, was represented by counsel who had the opportunity to confront and cross-examine witnesses. Furthermore, the hearing was held before an impartial decisionmaker. Because Michael was afforded procedural due process, we find that the juvenile court did not abuse its discretion in denying his motion for a continuance.

*Grounds for Termination.*

In Nebraska statutes, the bases for termination of parental rights are codified in § 43-292. Section 43-292 provides 11 separate conditions, any one of which can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012).

In its order terminating Michael's parental rights to My'Kyng, the juvenile court found that Michael substantially and continuously or repeatedly neglected and refused to give the child, or a sibling, necessary care and protection (§ 43-292(2)), and the child had been in out-of-home placement for 15 or more months of the most recent 22 months (§ 43-292(7)).

Michael asserts that the juvenile court erred in terminating his parental rights pursuant to § 43-292(2) and (7). Michael argues that My'Kyng's paternity was not established until the genetic testing, and that "[i]t is not at all clear from the record that [he] was aware of his paternity until this testing." Brief for appellant at 6-7. He claims that once he was contacted by Fuhrmann in February 2015, he obtained a DNA test within a month, and made efforts to have contact with My'Kyng.

Michael urges us to liken his case to *In re Interest of Dylan Z.*, 13 Neb. App. 586, 697 N.W.2d 707 (2005). The child in that case tested positive for drugs at the time of birth. The child was removed from the mother and placed in foster care due to the mother's drug use. One month after the child's birth, the mother identified the father. During the next four months, a caseworker for DHHS attempted to contact the father by calling a telephone number provided by the mother.

The caseworker called twice and although she never spoke to the father, she claimed to have left messages for him with his mother and sister. The caseworker never attempted to contact the father in any other way. The father presented evidence that the number called was not correct and that he was unaware he was the child's father until he was served with a supplemental petition in the juvenile court case, nearly 17 months after the child's birth. The father testified that he was aware the mother had given birth to a child and that the State had taken custody of the child immediately. He testified that he contacted a relative of the mother and inquired whether the child was his, but was specifically told that the child was not his. Upon being served, the father contacted DHHS, but he was denied visitation. The juvenile court found that the child was within the meaning of § 43-247(3)(a) due to the faults of habits of the father. The juvenile court also terminated the father's parental rights to the child pursuant to § 43-292(1), (2), and (7).

On appeal, this court found the record did not present clear and convincing evidence that the father intentionally abandoned the child (§ 43-292(1)); rather, the lack of contact was attributed directly to his lack of knowledge that he was the father. We noted that the record indicated that the father and mother were no longer together when the child was born, the father was not present at the child's birth, and the father was not named on the birth certificate. We also noted that the father was aware that the mother had been involved with another man approximately 9 or 10 months prior to the child's birth, in addition to being involved with the father. The father was aware that the mother had given birth and had made an effort to determine if he was the father by contacting a relative of the mother, but that person specifically informed him he was not the child's father. We also noted DHHS' minimal attempts to contact the father. Based on the above evidence, we also found that the State failed to prove by clear and convincing evidence that the father refused to give the child necessary care and protection (§ 43-292(2)). Additionally, although we found that the child had been in an out-of-home placement for the requisite period of time, we found that, on the facts of that case, it would be "fundamentally unfair" to charge that time period against the father prior to his knowledge that the child was his. Accordingly, we found that the juvenile court erred in finding that § 43-292(7) was proven. Finally, we found that the record did not support a finding by clear and convincing evidence that termination of the father's parental rights was in the child's best interests.

The State urges us to find this case more akin to *In re Interest of Chance J.*, 279 Neb. 81, 776 N.W.2d 519 (2009), and *In re Interest of Gabriella H.*, 289 Neb. 323, 855 N.W.2d 368 (2014). In *Chance J.*, the Nebraska Supreme Court reversed the judgment of this court, wherein we found no abandonment based on the husband's lack of actual knowledge that he was the child's father. In that case, a married couple separated due in part to the wife's prostituting herself. Less than a year later, the wife gave birth to a baby with white skin, blue eyes, and red hair. Because the husband was African-American, he did not believe he was the child's father. When the wife saw the child, she indicated that the child must have been "'a trick's baby.'" The husband made no further effort to try and determine whether the child was his and left the state. The State initiated juvenile proceedings against the wife and her rights were subsequently terminated. The State later filed a petition to terminate the husband's parental rights based partly on abandonment, and genetic testing subsequently established his paternity of the child. The juvenile court terminated the husband's parental rights pursuant to § 43-292(1), (2), and (9).

On appeal, this court reversed. We found the circumstances surrounding the child's birth indicated to the husband that he was not the child's father. We concluded that because the husband did not have actual knowledge that the child was his until genetic testing was completed, the father could not have intentionally abandoned the child (§ 43-292(1) and (9)). We further found that the record demonstrated that the husband's failure to parent the child was not due to indifference or intention to abandon or neglect the child, but a result of the husband's lack of knowledge that the child was his. Additionally, we said the record did not support a finding by clear and convincing evidence that the husband refused to give the child the necessary parental care and protection (§ 43-292(2)), because once the husband knew the child was his, he immediately took steps to become involved with the child as his father. Finally, we found that the record did not support the juvenile court's finding that termination of the husband's parental rights was in the child's best interests.

But the Supreme Court subsequently reversed the judgment of this court. The Supreme Court stated that "[i]t has long been the law that children born to the parties in a marriage are presumed legitimate until proved otherwise or decreed otherwise by the court." *In re Interest of Chance J.*, 279 Neb. at 90, 776 N.W.2d at 527. The court concluded that "paternal uncertainty based on physical appearance of a child or suspicions of infidelity is not just cause or excuse for abandoning a child born into wedlock, especially when there are ample means to verify one's paternity." *Id.*, 279 Neb. at 91, 776 N.W.2d at 527. Because the court found sufficient evidence of abandonment, it did not address § 43-292(2). The court found that termination of the husband's parental rights was in the child's best interests.

In *In re Interest of Gabriella H.*, 289 Neb. 323, 855 N.W.2d 368 (2014), the father's parental rights were terminated based on his abandonment of the child. In that case, the birth certificate did not identify the father, and he was not present for the child's birth. However, the mother had informed him that he might be the father. The child was taken into custody by DHHS upon her birth due to the mother's drug use. The mother identified the father as a potential father and he was approved to be present during visitation. During the first few months of the child's life, the father attended four visits over the course of six weeks, and the mother referred to the father as "the dad" when he attended visitation. After the father was incarcerated, he made no further attempts to be involved with the child, even though a caseworker sent a letter showing that DNA testing (done one year after the child's birth) had established him as the father. The juvenile court terminated the father's parental rights based on abandonment. On appeal, this court reversed due to the father's lack of absolute certainty concerning paternity until the DNA test and his incarceration while awaiting trial. But the Supreme Court subsequently reversed the decision of this court and concluded that the father abandoned the child after being initially involved. The child was 20 months old at the time of the termination hearing, but the father had last seen her at 3 months. The Court found sufficient evidence of abandonment. The Court noted that there was no evidence that the father ever believed himself not to be the father, and in fact held himself out as the father during visitations. The Court said that the lack of evidence as to any belief on the father's part that he was not the child's father distinguished the case from the situations in *In re Interest of Chance J.*, 279 Neb. 81, 776 N.W.2d 519 (2009), and *In re Dylan Z.*, 13 Neb. App. 586, 697 N.W.2d 707 (2005).

The present case is clearly distinguishable from *Chance J., supra*, because there is no evidence in our record that My'Kyng was a child born into wedlock. The present case is also distinguishable from both *Gabriella H., supra*, and *Dylan Z., supra*, and falls somewhere in the middle of those two cases.

In *Gabriella H., supra*, the father knew of his possible paternity and held himself out to be the child's father. In the present case, there is no evidence that Michael ever held himself out to be My'Kyng's father. And while there is no definitive evidence in the record before us that Michael knew of his possible paternity prior to being contacted by DHHS, there are certainly indications that he had such knowledge. For instance, Fuhrmann stated that when she took over the case in September 2014, Michael was the alleged father. And at the hearing on May 4, 2015, while requesting visitation, Michael's counsel stated "[t]here has been times when the father has seen him, but that hasn't happened within the last eight months"; eight months prior would have been in approximately September 2014, a time when, according to Fuhrmann, Michael was the alleged father. Moreover, during the February 2015 phone call, Fuhrmann offered to refer Michael to child support in regards to the paternity test, but he did not want the referral because "he did not want to pay a monthly payment"; at a minimum this shows he thought there was at least a possibility he was My'Kyng's father.

In *Dylan Z., supra*, the father was specifically informed that he was not the child's father and DHHS made minimal attempts to contact the father. In the present case, Michael was never informed that he was not the father. As stated previously, there is no definitive evidence in the record before us that Michael knew of his possible paternity prior to being contacted by DHHS in February 2015, but there are certainly indications that he had such knowledge. Furthermore, numerous attempts were made to contact Michael. In addition to the previous caseworker's attempts to contact Michael, Fuhrmann had made 15 attempts to locate Michael; she utilized N-Focus to find addresses and phone numbers for Michael, she called utility districts, checked local jails and prisons to see if he was incarcerated, and tried Facebook messaging.

We note that in its brief, the State asserts that "in August 2014, despite awareness of the open juvenile case for My'Kyng, [Michael] left [Andrea's] house when [a prior caseworker] arrived, preventing the [prior caseworker] from speaking to him." Brief for appellant at 18. There is no definitive evidence in the record before us that Michael knew, in August, that there was an open juvenile case for My'Kyng. The statement that Michael left Andrea's house before a caseworker could speak with him comes from Fuhrmann's affidavit which was attached and incorporated into the ex parte motion for temporary custody filed in April 2015. That affidavit appears only in the transcript and was not offered or received into evidence at the July adjudication/termination hearing. Thus, the affidavit will not be considered as evidence. See, e.g., *Mahmood v. Mahmud*, 279 Neb. 390, 778 N.W.2d 426 (2010) (in a protection order proceeding, the petition and affidavit cannot be considered as evidence until offered and accepted at the trial as such); *Hogan v. Garden County*, 264 Neb. 115, 646 N.W.2d 257 (2002) (in connection with a motion for summary judgment, the proponent of evidence must mark and offer the exhibit into evidence; unless the evidence is marked, offered, and accepted, it does not become part of the record and cannot be considered by the trial court as evidence in the case).

Even assuming that Michael had no knowledge of My'Kyng until the February 2015 call with Fuhrmann, and only considering evidence from that time forward, we find that Michael substantially and continuously or repeatedly neglected and refused to give the child, or a sibling, necessary care and protection (§ 43-292(2)).

When Michael declined Fuhrmann's offer of a referral to child support for paternity testing because "he did not want to pay a monthly payment," he demonstrated his unwillingness to fulfill his parental obligation to financially support his child.

On May 4, 2015, the juvenile court awarded Michael reasonable rights of supervised visitation with My'Kyng. Fuhrmann referred Michael for visitation, but he did not participate until June 24. Michael waited more than six weeks to begin visitation with My'Kyng. If he was really interested in having a relationship with My'Kyng, Michael would have begun visits immediately, especially knowing there was a pending motion to terminate his parental rights.

Also on May 4, 2015, the court ordered Michael to participate in "Permanency Mediation" as arranged by DHHS/NFC. Fuhrmann stated that she went through the referral process for the permanency mediation and the mediation center contacted Michael; mediation was to take place July 27, but Michael did not attend. Failing to attend a mediation three days prior to the scheduled termination hearing demonstrates Michael's unwillingness to work with the system to preserve his parental rights.

On July 8, 2015, the court ordered Michael to participate in and successfully complete a "Batterer's Intervention" course, undergo an "Initial Diagnostic Interview," and undergo a chemical dependency evaluation. Fuhrmann testified that she had been unable to set up those services because she had not been able to get in touch with Michael. This is concerning because in May 2015, Michael was ordered to maintain contact with the case manager and to notify the court, all counsel, and DHHS and NFC of any change of address and phone number within 48 hours of such change. Once again, despite a pending motion to terminate his parental rights, Michael showed a disinterest in taking the necessary steps to work with the system to preserve his parental rights.

Finally, Michael failed to appear at the termination hearing without explanation; such failure demonstrates nothing less than parental indifference toward My'Kyng.

Based on our de novo review of the record, we find that the State did prove by clear and convincing evidence that Michael substantially and continuously or repeatedly neglected and refused to give My'Kyng necessary parental care and protection (§ 43-292(2)).

We need not consider whether termination of Michael's parental rights was proper pursuant to § 43-292(7) since any one ground of the 11 identified in § 43-292 can serve as the basis for the termination of parental rights when coupled with evidence that termination is in the best interests of the child. See *In re Interest of Elizabeth S.*, 282 Neb. 1015, 809 N.W.2d 495 (2012). Thus, the next inquiry is whether termination is in the child's best interests.

*Best Interests.*

Under § 43-292, once the State shows that statutory grounds for termination of parental rights exist, the State must then show that termination is in the best interests of the child. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). But that is not all. A parent's right to

raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must also show that the parent is unfit. *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014).

There is a rebuttable presumption that the best interests of a child are served by having a relationship with his or her parent. *In re Interest of Nicole M., supra.* Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that a parent is unfit. *Id.* The term "unfitness" is not expressly used in § 43-292, but the concept is generally encompassed by the fault and neglect subsections of that statute, and also through a determination of the children's best interests. *Id.* Parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's wellbeing. *Id.* The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id.* And while both are separate inquiries, each examines essentially the same underlying facts as the other. *Id.*

Even assuming that Michael had no knowledge of My'Kyng until February 2015, and only considering evidence from that time forward, Michael made minimal effort to have a relationship with his son and preserve his parental rights. At the time of the termination hearing, Michael had seen My'Kyng approximately four times (once a week for two hours). Other than taking a paternity test and attending visitation (which he put off for six weeks after referral) Michael has done nothing to demonstrate interest in his son and has made no real effort to keep his parental rights intact. As stated previously, Michael did not keep the relevant persons informed of his contact information, he did not attend a court-ordered mediation, and did not even show up for the termination hearing.

Fuhrmann testified that based on the length of time the case has been open, the age of the child, and the father's lack of involvement with the case, it was in My'Kyng's best interest to terminate Michael's parental rights. We agree. "Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity." *In re Interest of Walter W.*, 274 Neb. 859, 872, 744 N.W.2d 55, 65 (2008). Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Ryder J.*, 283 Neb. 318, 809 N.W.2d 255 (2012). We acknowledge that there was not a lot of time between the February 2015 phone call with Fuhrmann and the termination hearing in July, but as stated previously, Michael showed no real interest and made no real effort during that time despite knowing of the pending motion to terminate his parental rights. We find that the State has rebutted the presumption of parental fitness. We further find that it is in My'Kyng's best interests that Michael's parental rights be terminated.

CONCLUSION

For the reasons stated above, we affirm the juvenile court's order terminating Michael's parental rights to My'Kyng.

AFFIRMED.